**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kriestan Lainie Gaitan, | No. CV-18-4594-PHX-DMF |
| Plaintiff, | |
| v. | **ORDER** |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Kriestan Lainie Gaitan ("Claimant") appeals the Commissioner of Social Security Administration's decision to adopt the Administrative Law Judge's (ALJ's) ruling denying her application for Disability Insurance Benefits under Title II of the Social Security Act. (Doc. 1)[1] Claimant argues that ALJ Michael Tucevich committed materially harmful error by: (1) improperly rejecting Claimant's testimony regarding her pain, other symptoms, and level of limitation; and (2) rejecting her treating physician's assessments and instead accepting the opinions of a non-examining physician. (Doc. 15 at 1-2, 12-24) Claimant filed her opening brief on June 10, 2019 (Doc. 15), Defendant filed his responsive brief on July 17, 2019 (Doc. 18), and Claimant then filed her reply on August 8, 2019 (Doc. 21).

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and with the parties' consent to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons

---

[1] Citation to the record indicates documents as displayed in the official Court electronic document filing system maintained by the District of Arizona under Case No. CV-18-04594-PHX-DMF.

set forth below, the Court will order the final decision of the Commissioner to be vacated and will remand this matter to the Commissioner for further proceedings consistent with this Order.

## I.    BACKGROUND

### A.    Application and Social Security Administration review

Claimant was 39 when she filed her application for disability insurance benefits in May 2015, alleging a disability onset date of January 1, 2013.  (Doc. 14-6 at 2-3)  She later successfully moved to amend her alleged onset date to August 5, 2015.  (Doc. 14-3 at 22)  The state agency initially determined Claimant was not disabled in July 2015 (Doc. 14-4 at 2-12), and again on reconsideration in December 2015 (*Id.* at 14-30).  After conducting a hearing on Claimant's applications on November 3, 2017 (Doc. 14-3 at 39-60), the ALJ filed a notice of an unfavorable decision on January 9, 2018.  (*Id.* at 19-32)  Claimant then filed an appeal with the Appeals Council, which was denied by notice dated October 10, 2018.  (*Id.* at 2-4)  At that point, the Commissioner's decision became final.  *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

### B.    Relevant medical treatment and imaging

#### 1.    *Abrazo Health Care*

In February 2015, Claimant was seen for a urinary tract infection.  (Doc. 14-8 at 88)  She was noted to have a full range of motion in her musculoskeletal system and a "nontender" back.  (*Id.* at 92)

#### 2.    *Valley Arthritis Care*

Claimant was treated at this practice between March 2015 and September 2017.  (Doc. 14-8 at 149-174; Doc. 14-9 at 170-178; Doc. 14-10 at 112-134)  In March 2015, pain on palpitation was noted bilaterally at the back of Claimant's neck, above the collarbone, at the top of her shoulders, at the back of her shoulders, at her buttocks, at the back of her upper thighs, and at the inner side of her knees.  (Doc. 14-8 at 163-164)  Claimant's symptoms persisted through appointments in May and November 2015, and January, March, and May 2016, along with her complaints of "shoulder symptoms, upper back pain

(between the shoulder blades), lower back pain, muscle aches, and diffuse bone pain, muscle pain, and joint pain." (Doc. 14-8 at 149, 152, 165; Doc. 14-9 at 173-175, 176-178; Doc. 14-10 at 123-131)

Beginning in May 2016, Claimant reported proximal interphalangeal joint pain upon motion in some of the fingers on both hands. (Doc. 14-10 at 125) In July 2017, Claimant's examination notes identified her bilateral pain in the back of her head, the back of her shoulders, the back of her neck and inside her shoulder blades, her buttocks, her hips, her inner knees, and her lower neck as trigger points. (*Id.* at 120) Claimant received trigger point injections in September 2017. (*Id.* at 116) She complained of morning stiffness. (*Id.* at 112, 123, 126, 129) Throughout her treatment history by this practice, Claimant was noted to have displayed normal motor strength and normal gait and stance. (Doc. 14-8 at 149-174; Doc. 14-9 at 170-178; Doc. 14-10 at 112-134)

### 3. Integrated Medical Service Primary Care

In June 2014, Claimant was seen for pain in her arms and legs, and severe back pain with urinary tract infection symptoms. (Doc. 14-9 at 22-25) She reported pain "just about 'everywhere' all the time" with no pattern to the pain. (*Id.* at 22) In September 2014, Claimant was seen for back pain that radiated down both legs but with no muscle weakness. (*Id.* at 17) In November 2014, Claimant was undergoing physical therapy for her lower back pain and reported being unable to perform the physical duties of a certified nurse assistant ("CNA"). (*Id.* at 14) Her exam notes indicated limb pain but no lower back pain, and numbness and tingling in her legs, but no leg weakness. (*Id.* at 16) In January 2015, Claimant was noted to suffer from moderately severe arthralgia in both shoulders, both knees, and in her lower back. (*Id.* at 9) She complained of shoulder, mid-back, and lower back pain. (*Id.* at 11)

In August 2015, Claimant reported symptoms that placed her at risk for moderate depression. (*Id.* at 112) She indicated she had joint pain but no fatigue. (*Id.* at 115) In February 2016, Claimant was noted to suffer fibromyalgia moderate in severity, joint pain and stiffness, and fatigue. (Doc. 14-10 at 43, 46) In July 2016, Claimant's pain symptoms

were reported to be worse when standing or sitting for over 20-30 minutes, and that she had to change positions. (*Id.* at 25) She reported joint pain and stiffness, but no fatigue. (*Id.* at 28) Her examination notes indicated she displayed full strength. (*Id.*) In April 2017, Claimant reported no "back or neck spinal or muscle tenderness, [and] no muscle spasticity." (*Id.* at 21) No depression or anxiety were noted. (*Id.* at 20) In June 2017, again Claimant reported no fatigue, back or neck tenderness. (*Id.* at 13-14) On August 1, 2017, Claimant displayed fair symptom control of her neck and back pain with treatment, but that her symptoms from fibromyalgia had become severe. (*Id.* at 2) She was observed for the first time to demonstrate changes in gait. (*Id.* at 6) However, on August 8, 2017, Claimant exhibited normal gait and station, and normal "inspection/palpitation of joints, bones, and muscles." (*Id.* at 69)

### 4. Valley Pain Consultants

In September 2015, Claimant presented with fibromyalgia symptoms. (Doc. 14-9 at 147-149) She complained of constant pain in her neck, back, arms, feet and knees. (*Id.* at 147) She reported her symptoms worsened with stress and sleep deprivation and that she was then being treated with non-opioid analgesics. (*Id.*) She complained of an average pain level of 7 out of 10. Claimant demonstrated full muscle strength and tone and normal reflexes but was tender to palpitation over the "classically described fibromyalgia tender points." (*Id.* at 148) On examination, Claimant exhibited full range of motion in her cervical and lumbosacral spine and no pain or tenderness to palpitation in her bilateral shoulders or hips. (*Id.*) She received sacroiliac joint injections in October and November 2015. (*Id.* at 146, 155) In December 2015, her review of symptoms indicated anxiety, changes in sleep pattern, and depression. (*Id.* at 181)

In November 2016, Claimant reported 80% pain improvement after a medial branch block procedure to her lumbar spine and requested radiofrequency ablation to her bilateral lumbar spine. (*Id.* at 194) Her review of symptoms indicated no anxiety, changes in sleep pattern, or depression. (*Id.* at 193)

### 5. *Imaging*

A four-view x-ray imaging was conducted on Claimant's lumbar spine on August 15, 2014. The imaging indicated mild degenerative disc disease at T12-L1, with no evidence of spondylosis and no significant facet arthropathy. (Doc. 14-9 at 111)

### C. **Medical source statements**

#### 1. *Steve Sumpter, D.O. and Iain Black, P.A.-C*

On August 5, 2015, Dr. Sumpter completed a "Medical Assessment of Ability to Do Work-Related Physical Activities" form regarding Claimant's limitations. (Doc. 14-8 at 175-176) Dr. Sumpter treated Claimant at Integrated Medical Services. (Doc. 14-9 at 136) He listed her diagnoses impacting her ability to function as severe back pain, sciatica, lumbago, neuropathy, fibromyalgia, and diabetes. (Doc. 14-8 at 175) Dr. Sumpter opined that in an 8-hour work day, Claimant could sit for less than 2 hours, lift and carry less than 10 pounds, and stand and/or walk for less than 2 hours. (*Id.*) He estimated that Claimant would require alternating between sitting, standing, or walking every 21 to 45 minutes and that she would require rest between position changes for 10 to 15 minutes. (*Id.*) Dr. Sumpter declared that Claimant could use her hands and feet, bend, reach, or stoop only 0% to 20% of a work day. (*Id.*) He further stated that Claimant suffered from severe pain, fatigue, and dizziness and that she would miss six or more days of work each month due to her medical conditions. (*Id.* at 176)

Dr. Sumpter filled out the same form again on August 1, 2017, expressing the same medical opinions he identified in the August 2015 assessment. (Doc. 14-9 at 184-185)

On October 9, 2017, P.A.-C Iain Black wrote an opinion concluding that Claimant was "disabled for all competitive work requirements." (Doc. 14-10 at 135) He described Claimant's limitations as including lifting and carrying weights, sitting for prolonged periods, walking, reaching, bending and kneeling. (*Id.*) Black was not able to quantify the limits to standing, sitting, or lifting. (*Id.*) He stated that Claimant had been "consistent and believable" in her reports of the degree of pain, fatigue, and other limitations to her activities of daily living caused by her symptoms. (*Id.*)

### D.     Examining consultant evaluation

####     1.     *Shaunna Sukey Haley., Psy.D.*

Dr. Haley conducted a psychological survey with mental status exam of Claimant on November 18, 2015.  (Doc. 14-9 at 160-166)  Dr. Haley indicated that Claimant's posture was normal, her gait/mobility was slow, her dexterity was normal, and her pain behavior indicated a pain level of 6 out of 10.  (*Id.* at 161)  Claimant explained that she had applied for disability benefits because she had worked for more than 20 years as a CNA and could no longer do that job, that she suffered chronic pain, her diabetes symptoms were "up and down," she had bouts of dizziness, and she was not able to function like she used to.  (*Id.*)  Describing her activities of daily living, Claimant reported to Dr. Haley that she would get up at 5:00 a.m. with her older sons and that after they left for school she would lie down until 7:00 a.m. when she would get up again and get her youngest son "ready and off to school."  (*Id.*)  Claimant said she would then take her medications and lie back down.  (*Id.*)  When her young daughter woke up, Claimant said she would again get up, fix breakfast and watch some shows and play together.  (*Id.*)  She explained that when her daughter napped, she would also nap, and afterwards "do some of the dishes."  (*Id.*)  Later she and her daughter would rest but not sleep, after which her sons would come home and help with chores.  (*Id.*)  Claimant said she would usually cook meals in a crockpot or in the oven because she was not able to stand at the stove.  (*Id.* at 164-165)  She stated she was not able to perform housecleaning or yard work, that she could sometimes walk by leaning on a shopping cart and at other times needed to ride in an electric cart, that she encountered difficulty remembering to pay bills and take medications, and that her children helped with laundry, although she was able to fold laundry while sitting.  (*Id.* at 165)

In her assessment summary, Dr. Haley reported that Claimant presented with a dysthymic mood and low energy level and that she "rambled" while discussing her medical conditions but was "easily redirected."  (*Id.*)  Claimant scored 30 out of 30 on the Mini-Mental Status Exam.  (*Id.*)  The doctor stated that Claimant said she experienced anhedonia daily, and sometimes also feelings of guilt and hopelessness and that the antidepressants

she was prescribed were "partially effective." (*Id.*) Dr. Haley documented that Claimant said she had "never received formal mental health treatment" and seemed receptive to obtain such treatment but "stated she was not sure she would have time to participate in services." (*Id.* at 165-166) Dr. Haley opined that Claimant appeared competent to manage benefit payments. (*Id.* at 166)

Dr. Haley completed a Psychological-Psychiatric Medical Source Statement based on her assessment. (*Id.* at 167-168) The doctor opined that Claimant was able to understand and answer simple questions, that there "was no evidence of distractibility as questions did not need to be repeated," and that Claimant "should be able to adapt to simple tasks." (*Id.* at 167-168) She further suggested that "[i]n an employment setting, [Claimant] may require support from a supervisor or coworker who can explain tasks, give direction, and redirect." (*Id.*at 168)

### E. State agency non-examining consultant assessments

#### 1. *Charles Combs, M.D.*

On initial review of Claimant's application, non-examining consultative reviewer Charles Combs, M.D., considered Claimant's records received as of July 2, 2015. (Doc. 14-4 at 2-12) Dr. Combs concluded that Claimant was subject to some limitations, that the record did not include "sufficient vocational information to determine whether you can perform any of your past relevant work," but was sufficient to determine that she was capable of adjusting to other work. (*Id.* at 12)

#### 2. *Stephen Fair, Ph.D. and Martha A. Goodrich, M.D.*

On reconsideration, the reviewers examined records received as of December 8, 2015, including the psychological assessment performed by Dr. Haley and the August 2015 medical source statement of Dr. Sumpter. (Doc. 14-4 at 14-30) The reviewers concluded that Claimant's mental health and cognitive impairments were not severe. (*Id.* at 25) Further, it was noted that Dr. Sumpter's medical source statement "would indicate that the [Claimant] is essentially bedridden and unable to feed, bathe or dress herself. This [medical source statement] is inconsistent with even the [Claimant's] own self-reported

[activities of daily living]." (*Id.* at 28)  In determining that Claimant was "not disabled" on reconsideration, the reviewers advised her that on review of the record, they found she was capable of performing "lighter type exertions." (*Id.* at 30)  They again concluded there was insufficient vocational information on whether she could perform past relevant work but found she could adjust to other work.  (*Id.*)

## II.     STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to adopt the ALJ's findings if his findings are supported by substantial evidence and are free from reversible error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).  "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).  The court reviews "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

In determining whether substantial evidence supports the ALJ's decision, the court considers the whole record, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the record, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If there is sufficient evidence to support the ALJ's outcome, the Court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citations omitted).

## III. LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601. She meets this burden if she can establish that she has a physical or mental impairment that prevents her from engaging in any substantial gainful activity and which is expected to result in death or to last for a continuous period of at least one year. 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A). Claimant's impairments must be such that she is not only unable to perform her past relevant work, but she cannot, considering her age, education and work experience, engage in other substantial gainful work existing in the national economy. *Id.* at §§ 423(d)(2) and 1382c (a)(3)(B).

The Commissioner applies a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520 and 416.920. In the first three steps, the Commissioner determines: (1) whether a claimant has engaged in substantial gainful activity since the alleged onset; (2) whether she has a "severe" impairment or a combination of impairments that is "severe"; and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1). *Id.* If a claimant complies with these three steps, she will automatically be found disabled; if the claimant satisfies steps one and two but not three, she must then satisfy step four. *Id.*

Before considering step four, the ALJ must assess the claimant's residual functional capacity ("RFC"), *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [the claimant] can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)). The RFC assessment is "based on all the relevant medical and other evidence" in the claimant's record. *Id.* (quoting 20 C.F.R. § 404.1520(e)). In determining a claimant's RFC, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a)(2).

At step four, the ALJ considers the claimant's RFC and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant can perform her past relevant work, she is not found to be disabled. *Id.*

When a claimant satisfies step four, the burden shifts from her to the Commissioner to establish the claimant is able to perform work in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five). The fifth and final step involves the ALJ's decision whether a claimant can make an adjustment to other work, given the ALJ's assessment of the claimant's RFC and age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(v).

## IV. THE ADMINISTRATIVE HEARING

The ALJ conducted a hearing on Claimant's application on November 23, 2017. (Doc. 14-3 at 39-60) Claimant's attorney made opening comments stating that he believed Claimant's case was primarily founded on her fibromyalgia symptoms with "some orthopedic components." (*Id.* at 43) On questioning from the ALJ, Claimant reported she had completed tenth grade and had obtained a CNA certificate. (*Id.* at 44-45)

Dr. Darius Ghazi, a non-treating, non-examining orthopedic surgeon testified at the hearing. (*Id.* at 41) The ALJ asked Dr. Ghazi if, on review of Claimant's medical record, he believed Claimant would meet or equal any listings. (*Id.* at 45) The doctor said that in his opinion she would not. (*Id.*) The ALJ asked what Dr. Ghazi's diagnosis of Claimant would be and what physical functional limitations she would have. (*Id.* at 46) Dr. Ghazi listed diagnoses of fibromyalgia, morbid obesity, thyroid "issues," carpal tunnel surgery on her left side, and lumbar and cervical degenerative disc disease "basically age appropriate for 41 years of age." (*Id.* at 46) He said that he couldn't "really put my finger on any particular diagnosis other than just generalities related to her obesity and endocrinological conditions." (*Id.*) The doctor opined that Claimant would be limited in walking and standing due to her weight, and that she should only occasionally bend or stoop. (*Id.* at 47) He concluded that Claimant could not climb ladders and should not be subjected to unprotected heights or other hazards. (*Id.*) He said that Claimant could sit and function, but that she needed to lose weight to bring her diabetes symptoms under control and also "take care of her endocrinology issues." (*Id.*) On questioning by

Claimant's counsel, Dr. Ghazi confirmed that the doctor's opinions were limited to "objective findings" in "an orthopedic context." (*Id.* at 48)

On questioning by her attorney, Claimant testified she experienced pain "every day, all over." (*Id.* at 49) She stated that the pain could be caused variously by standing or sitting or lying down too long and that it was "never just the same thing." (*Id.* at 50) She reported having to take two to three 30- to 60-minute naps daily because of pain and fatigue. (*Id.*) She said she was seeing a rheumatologist for symptoms of fibromyalgia, rheumatoid arthritis, and neuropathy, and that this doctor had prescribed her medication for each diagnosed condition. (*Id.* at 51) Claimant declared that the medications helped for only the first day or two. (*Id.*) She said she had undergone trigger point injections. (*Id.*)

Claimant stated she lived at home with sons aged 20, 18, and 14, and a daughter who was 4. (*Id.*) She said her parents helped her pay bills and that she received food stamps and cash assistance from the state. (*Id.*) She further explained that her children's father was not in their life but that she was attempting to enforce child support obligations. (*Id.* at 52) Claimant mentioned that her oldest son worked and helped support the family and that her middle son received disability checks. (*Id.*)

Claimant reported that after 30 minutes of standing she would have neuropathy in her feet and that she normally could only stand for 15 to 20 minutes without symptoms. (*Id.*) Similarly, Claimant explained she could sit for only 15 or 20 minutes before needing to stand up or lie down. (*Id.* at 53) She stated she could walk for 10 to 15 minutes, but if she had something to hold on to, she could "go a little bit further." (*Id.*) She estimated she could lift no more than 10 pounds. (*Id.*) Claimant said that if she were able to return to work, she would have family help caring for her young daughter. (*Id.* at 54)

The vocational expert ("VE") testified that Claimant would be unable to perform her past relevant work, assuming she had no limitations on sitting and was limited to 4 hours of standing and walking during an 8-hour work day. (*Id.* at 55) However, the VE determined that Claimant would be capable of performing other jobs in the national or local

economy, including the jobs of document preparer, telemarketing representative, and parking lot cashier or fuel island courtesy booth operator. (*Id.* at 55-56)

On cross-examination, Claimant's counsel asked the VE to assume a hypothetical individual who, during an 8-hour work day, could sit for less than 2 hours and stand or walk for less than 2 hours. (*Id.* at 57) The VE opined that such an individual would be unable to perform Claimant's past relevant work as a certified nurse's assistant or any other work. (*Id.*) Claimant's counsel then posed a series of hypothetical circumstances in which an individual: (1) required a break of 10 to 15 minutes every 21 to 45 minutes throughout a work day; or (2) would be off task 11 percent or more of an 8-hour work day; or (3) would be absent 3 or more days a month on a sustained basis; or (4) would need to take three breaks of 30 to 60 minutes over the course of a work day. (*Id.* at 57-58) The VE testified that each of these circumstances would prevent an individual from qualifying for employment. (*Id.* at 58) Claimant's counsel asked the VE whether there was a point at which the need for extra supervision and redirection of an employee would be excessive in a competitive market. (*Id.*) The VE answered that unskilled work commonly required extra supervision but that an individual would have difficulty maintaining employment if she frequently deviated from instruction on a specific task. (*Id.* at 59)

## V.    ALJ's DECISION

The ALJ issued his unfavorable decision on January 9, 2018. (Doc. 14-3 at 19-32) The ALJ concluded that Claimant's date last insured was September 30, 2018, meaning Claimant must establish disability on or before that date to qualify for benefits. (*Id.* at 24) The ALJ concluded that Claimant had not engaged in substantial gainful activity since August 5, 2015, Claimant's alleged onset date. (*Id.*) The ALJ found that Claimant suffered from the severe impairments of obesity, degenerative disc disease, cervical spondylosis, and fibromyalgia. (*Id.* at 24-26) The ALJ further found that Claimant did not have an impairment or combination of impairments meeting or medically equaling the severity of a listed impairment as defined in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 26)

The ALJ concluded that Claimant retained the RFC to perform:

light work as defined in 20 CFR 404.1567(b) except with the following additional limitations: The claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for 4 hours out of an eight-hour day. She can sit for six hours out of an eight-hour day. The claimant can occasionally climb stairs and ramps; but, never climb ropes, ladders and scaffolds. The claimant can occasionally kneel, crouch and crawl. She is restricted from exposure to unprotected heights and moving and dangerous machinery.

(*Id.* at 27)

The ALJ stated that while the medical evidence supported the conclusion that Claimant's impairments "could reasonably be expected to cause the alleged symptoms[,]" Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.* at 28) The ALJ found that Claimant was not able to perform her past relevant work. (*Id.* at 30) However, the ALJ found there were jobs existing in significant numbers in the national economy that Claimant could perform, including the sedentary, unskilled job of telemarketer representative and the light, unskilled job of parking lot cashier. (*Id.* at 31-32) Accordingly, the ALJ held that Claimant had not been under a disability as defined in the Social Security Act from her alleged onset date of August 5, 2015, through the date of the decision. (*Id.* at 32)

## VI. DISCUSSION

As noted, Claimant argues the ALJ erred by: (1) rejecting Claimant's symptom testimony "in the absence of specific, clear, and convincing reasons supported by substantial evidence in this record as a whole[;]" and (2) rejecting Dr. Sumpter's medical source statements and instead granting "great weight" to the opinions of Dr. Ghazi, a non-examining physician. (Doc. 15 at 1-2) Each argument is addressed in turn.

### A. The ALJ failed to provide clear and convincing reasons for rejecting Claimant's pain and symptom testimony

As noted, employing customary language, the ALJ stated that he found Claimant's "medically determinable impairments could reasonably be expected to cause [her] alleged

symptoms[,]" but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Doc. 14-3 at 28)

If the ALJ finds that Claimant is not malingering, and Claimant "provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms alleged, the ALJ may 'reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492-93 (9th Cir. 2015) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). "The clear and convincing standard is the most demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002). This standard is not met by the ALJ "simply stat[ing] [his] non-credibility conclusion and then summariz[ing] the medical evidence." *Brown-Hunter*, 806 F.3d at 494. Instead, an ALJ must identify which testimony he considers not credible, and "link that testimony to the particular parts of the record supporting [his] non-credibility determination." *Id.* The ALJ's opinion "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (internal quotations and citations omitted).

The ALJ determined that Claimant would be unable to perform her past relevant work as a CNA because the physical demands of this job exceeded the RFC the ALJ identified for her. (Doc. 14-3 at 30) In arriving at his conclusion that Claimant could perform light work with certain restrictions, the ALJ appeared to have relied primarily on examination notes indicating that Claimant exhibited a normal range of motion, full muscle strength, and "largely normal neurologic and musculoskeletal findings." (*Id.* at 28) In the Ninth Circuit, however, these examination observations have been characterized as "perfectly consistent with debilitating fibromyalgia." *Revels v. Berryhill*, 874 F.3d 648, 666 (9th Cir. 2017). In *Revels*, the Ninth Circuit explained that the ALJ had "stated that

[the claimant's] testimony was undercut by the lack of "objective findings" supporting her claims of severe pain[,]" and "cited medical records showing that, at several doctor's appointments, Revels exhibited normal muscle strength, tone, and stability, as well as a normal range of motion." *Id.* The Ninth Circuit found this reasoning was erroneous because normal muscle strength and range of motion were not properly considered in view of the claimant's fibromyalgia diagnosis. *Id.*

Defendant repeats these same mistaken arguments and additionally argues that the ALJ noted that Claimant's reports of activities of daily living were consistent with the RFC he proposed but were inconsistent with her claim of disability. (Doc. 18 at 20-21) The ALJ discussed Claimant's statements describing how she got her children ready for school, cared for her two-year-old daughter during the day without assistance, prepared simple meals in a crockpot or the oven, and was able to perform her self-care needs. (Doc. 14-3 at 25) This discussion, however, was addressed only in the ALJ's consideration of the severity of Claimant's mental health limitations and the ALJ did not discuss Claimant's activities of daily living either explicitly or by reference with respect to Claimant's claim that she was disabled because of physical impairments. (*Id.* at 18-19) The ALJ made no effort to discuss with any specificity how Claimant's activities of daily living indicated she was able to perform the work activities defined in the RFC he proposed for her.

The ALJ also observed that Claimant had received sacroiliac joint injections in October and November 2015 and concluded that she had undergone only "routine, conservative treatment" since her alleged onset date. (*Id.* at 28-29) The record indicates that these injections were given to address low back pain in association with her diagnosis of fibromyalgia. (Doc. 14-9 at 158) Claimant also underwent medial branch blocks to her lumbar spine and steroid injections to trigger point sites. (Doc. 14-9 at 194, Doc. 14-10 at 116) In *Revels*, the Ninth Circuit found the ALJ had erred in rejecting a claimant's symptom testimony based on her "supposedly 'conservative' treatment" when the claimant had been treated for fibromyalgia symptoms with facet and epidural injections to her back and neck and steroid injections in her hands and she had been prescribed antidepressants,

anti-anxiety medication, nerve pain medication, muscle relaxants and narcotic painkillers. *Revels*, 874 F.3d at 667. The court instructed that "[a]ny evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated[,]" and noted that the ALJ had "provided no explanation why he deemed this treatment 'conservative' for fibromyalgia." *Id.* Similarly, here Claimant had received several courses of steroid injections associated with her diagnosis of fibromyalgia and was prescribed antidepressants and anti-anxiety medication and muscle relaxants. The ALJ failed to explain why Claimant's course of treatment was conservative specifically as to her diagnosis of fibromyalgia.

The Court finds the ALJ erred by failing to provide specific, clear and convincing reasons supported by substantial evidence for rejecting Claimant's testimony about her pain symptoms and her level of limitation.

**B.** **The ALJ erred by rejecting the opinions of Steve Sumpter, D.O. and by according great/significant weight to non-examining medical consultants**

Claimant argues that the ALJ committed materially harmful error when he rejected Dr. Sumpter's medical assessments of Claimant's ability to perform work-related activities and instead accepted the opinions of non-examining orthopedic surgeon Dr. Ghazi. (Doc. 15 at 12-20)

In his decision, the ALJ discussed the opinions of Darius Ghazi, M.D., a non-examining orthopedic surgeon and of treating physician Steve Sumpter, D.O., as well as the RFC opinions of the state agency medical consultants at the reconsideration level. (Doc. 14-3 at 29-30) Summarizing Dr. Ghazi's testimony at the hearing, the ALJ noted the doctor testified that the medical record indicated Claimant had been diagnosed with a long list of ailments, including fibromyalgia. (*Id.* at 29) The ALJ stated that Dr. Ghazi testified there were no physical findings to demonstrate any abnormalities, no physical test to rule out a diagnosis, and that Claimant's impairments were all age-related. (*Id.*) The ALJ further stated that Dr. Ghazi identified work place limitations in walking, standing, bending, and stooping that were due to obesity, and opined that Claimant should lose

weight. (*Id.*) The ALJ concluded that Dr. Ghazi was well-qualified in his field (orthopedics), that his opinion was "based on a thorough review of the evidence of record," and therefore accorded Dr. Ghazi's opinion "great weight." (*Id.*)

The ALJ explained that Claimant's treating physician, Dr. Sumpter, reported her diagnoses as including severe back pain, neuropathy, diabetes, fibromyalgia, lumbago, and sciatica. (*Id.*) The ALJ summarized Dr. Sumpter's opinions contained in the medical assessments dated August 5, 2015, and August 1, 2017. (*Id.*) The ALJ then summarily concluded that Dr. Sumpter's opinions were "not consistent with the objective findings and other opinion evidence[,]" and stated he afforded Dr. Sumpter's opinions "little weight." (*Id.* at 29-30)

The ALJ also determined that the opinions on Claimant's RFC offered by the non-examining state agency medical consultants at the reconsideration level should be accorded "significant weight." (*Id.*) The ALJ concluded that the consultants' rationales and conclusions were "consistent with the persuasive objective evidence and the claimant's activities of daily living." (*Id.*)

The ALJ is required to evaluate every medical opinion he receives. 20 C.F.R. § 404.1527(b). In determining how much deference to give a physician's medical opinion, the Ninth Circuit distinguishes between the opinions of treating physicians, examining physicians, and non-examining physicians. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Generally, an ALJ should give the greatest weight to a treating physician's opinion and more weight to the opinion of an examining physician than a non-examining physician. *See Andrews v. Shalala*, 53 F.3d 1035, 1040-41 (9th Cir. 1995); *see also* 20 C.F.R. § 404.1527(c)(1)-(6) (listing factors to be considered when evaluating opinion evidence, including length of examining or treating relationship, frequency of examination, consistency with the record, and support from objective evidence). However, an ALJ "'need not accept the opinion of any physician, including a treating physician, if that opinion is . . . inadequately supported by clinical findings.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947,

957 (9th Cir. 2002)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31). To meet this requirement, the ALJ must provide "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

The ALJ erred by summarily rejecting Dr. Sumpter's opinions. As noted, the ALJ assigned the opinions "little weight" because they were "not consistent with the remainder of the objective findings and other opinion evidence." (Doc. 14-3 at 29-30) However, the ALJ provided no other explanation for his conclusion and failed to cite a single individual record to support the conclusion. The closest the ALJ came to supporting his conclusion was in his discussion about Claimant's fibromyalgia symptoms, in which he reported that:

> [a] physical examination in April 2013 showed extremities with "no" edema, "no" cyanosis, "no" chubbing; a joint exam showed "no" swelling, "normal" range of motion and a neurologic exam showed motor strength as "5/5 both sides", "no" fine tremor in both hands, "monofilament sensation is "intact" and vibration sensation as "intact" (Exhibit 2F/4). Another physical examination showed the claimant had no obvious musculoskeletal deformities and was able to move all 4 extremities, voluntarily (Exhibit 6F/4). Another physical examination on February 23, 2015 showed musculoskeletal with a normal range of motion (Exhibit 9F/2). As well, there is evidence that it was recommended the claimant exercise; however, there is no evidence that she followed her doctor's advice to exercise (Exhibit 2F/5) As of October 2015, the record shows largely normal neurologic and musculoskeletal findings (Exhibit 16F/4).

(*Id.* at 28) These references to the record do not contradict Dr. Sumpter's opinions because they primarily address findings of Claimant's normal range of musculoskeletal motion and full muscle strength, indicators which are not inconsistent with disabling fibromyalgia, as is discussed above. Further, these citations do not refute the doctor's opinion that Claimant suffers from severe pain and fatigue. (Doc. 14-9 at 184-185)

The ALJ erred by rejecting Dr. Sumpter's medical assessment opinions on the basis only of unspecified "objective findings and other opinion evidence." "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). The ALJ did not do so in this case. He failed to provide specific and legitimate reasons for rejecting Dr. Sumpter's opinions supported by substantial evidence.

As noted, the ALJ accorded "great weight" to the opinions of non-examining physicians Darius Ghazi and "significant weight" to the opinions of the non-examining state agency medical consultants at the reconsideration level. (Doc. 14-3 at 29-30) The ALJ based his acceptance of Dr. Ghazi's opinions on the doctor's qualifications in his field of orthopedics, and because he found the opinions were founded on "a thorough review of the evidence of record." (*Id.* at 29) The ALJ found the opinions of the state agency medical consultants were "consistent with the persuasive objective evidence and the claimant's activities of daily living." (*Id.* at 30) "Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Morgan v. Comm'r of Soc. Sec. Admin. Andrews*, 169 F.3d 595, 600 (9th Cir. 1999). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Id.* (quoting *Magallanes*, 881 F.2d at 750 (quoting *Cotton v. Bowen,* 799 F.2d 1403, 1408 (9th Cir. 1986))). The ALJ's reasons for accepting the opinions of Dr. Ghazi and the state agency medical consultants failed to set out "a detailed and thorough summary of the facts and conflicting clinical evidence," and he neither specified the relevant "conflicting clinical evidence" nor made findings in support of his summary conclusions. Accordingly, the ALJ erred by failing to adequately support his decision to reject the medical assessments of treating physician Dr. Sumpter and to instead rely on the opinions of non-examining physicians.

For the above reasons, the Court finds that the ALJ erred in rejecting the opinions of treating physician Sumpter and in according "great weight" and "significant weight" to

the opinions of non-examining medical consultant Dr. Ghazi and the state agency medical reviewers, respectively.

## VII. CONCLUSION

For the reasons discussed above, the Court holds the ALJ erred by rejecting Dr. Sumpter's medical opinions and Claimant's symptom testimony. Given that the ALJ's RFC determination was based on these errors, the Court cannot deem the errors harmless.

## VIII. REMAND FOR FURTHER PROCEEDINGS

Claimant urges the Court to remand for payment of benefits or, alternatively, for additional proceedings. (Doc. 15 at 25) The Commissioner urges the Court to affirm the Commissioner's final decision or, alternatively, to remand for further proceedings if it finds the ALJ committed harmful error. (Doc. 18 at 23-25)

In the Ninth Circuit, a remand with instruction to award benefits is appropriate if each of three circumstances exist: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence …; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. A court's decision to remand a disability benefits case to the Social Security Administration for payment of benefits or for further proceedings is discretionary. *Harman v. Apfel*, 211 F.3d 1172, 1173 (9th Cir. 2000). However, remand for an award of benefits is granted only in "rare circumstances," "where no outstanding issues remain and further proceedings would not be useful" and where "the record, taken as a whole, leaves not the slightest uncertainty as to the outcome of [the] proceeding." *Treichler*, 775 F.3d at 1100-01 (citation and internal quotation marks omitted). *See also Leon v. Berryhill*, 880 F.3d 1041, 1044 (9th Cir. 2017), amended Jan. 25, 2018 ("An automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule.") Instead, generally the court will "remand to the agency for additional investigation or explanation." *Treichler*, 775 F.3d at 1099 (citation and internal quotation marks omitted).

In *Treichler*, the Ninth Circuit cited with approval its earlier decision to remand a case after an ALJ "erred in making inadequate findings to support his conclusion that the claimant was not credible" and to allow "'further findings evaluating the credibility of [claimant's] subjective complaints,' while noting that on remand the ALJ could deny benefits if he made adequate findings." *Id.* (quoting *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995)). Moreover, this Court cannot conclude that the record provides "not the slightest uncertainty as to the outcome." *Id.* at 1101.

Further proceedings are appropriate here because the ALJ must: (1) provide specific, legitimate reasons for rejecting Dr. Sumpter's medical opinion; and (2) set forth specific, clear, and convincing reasons for rejecting Claimant's symptom testimony, providing specific citations to the medical record to support his conclusions.

Accordingly,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **VACATED** and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment.

Dated this 31st day of October, 2019.

_____
Honorable Deborah M. Fine
United States Magistrate Judge

- 21 -